UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) ) ) | 2:19-CR-145 |
| vs. | ) ) | |
| LYNN RICHARD NORTON, | ) ) | |
| Defendant. | ) ) | |

**REPORT AND RECOMMENDATION**

Defendant Norton filed a Motion to Suppress and supporting Memorandum on September 10, 2020. [Docs. 255-56]. In his Motion, Defendant specifically alleges his constitutional rights were violated when he was subjected to an unlawful vehicle stop and was "violently" seized from the vehicle following the stop [Doc. 255, p.1]. Defendant further submits that the vehicle in which he was stopped was unlawfully searched, and the fruits of the unlawful search resulted in his arrest. The United States filed a Response opposing Defendant's Motion on November 19, 2020 [Doc. 301]. An evidentiary hearing on Defendant's Motion was held on February 10, 2021 after being reset due to increasing COVID-19 cases in this District. This matter is before the Court pursuant to 28 U.S.C. § 636(b) and the standing orders of the District Court for a Report and Recommendation.

I. **FACTUAL FINDINGS**

On May 11, 2019, law enforcement officers with the Hamblen County Drug Task Force were stationed at a storage unit complex on St. Clair Road in Whitesburg, Tennessee to surveille Defendant Norton's residence located at 7205 St. Clair Road. The home was known to local law enforcement as a place where illicit drug sales were occurring and in fact, officers had conducted

a controlled buy from Defendant in the month prior to the date in question. Hamblen County Deputy Sheriff David Barker, a K9 officer, and former Deputy Sheriff Chris Giles were conducting the surveillance in Deputy Barker's unmarked truck.

Deputy Barker testified that officers had only been conducting surveillance for a short time on the date in question when they observed a light blue Chevrolet pickup truck leave the residence. Deputy Barker and then Deputy Giles[1] decided to follow the vehicle. According to Deputy Barker's testimony, officers hoped to stop the vehicle in furtherance of their drug investigation should a legal basis for a stop present itself. Shortly after officers began following the truck, Deputy Barker and Deputy Giles testified that they observed the blue pickup's driver side tires cross the double yellow line at least twice. According to Deputy Barker, in reliance on that violation, he activated his blue lights. Initially, the two individuals seen in the vehicle looked back at the police vehicle and slowed; however, instead of stopping, the blue truck accelerated away from officers. Thereafter, officers pursued the pickup truck as it travelled toward Russellville, Tennessee. During the pursuit, officers observed the pickup truck run two stop signs, one at Depot Street and East Andrew Johnson Highway and another at Warrensburg Road and Silver City Road. Officers could not make out the identities of the truck's occupants because the windows were tinted, and they maintained a safe distance between their vehicle and the pickup truck.

The pickup truck ultimately stopped at the end of Smyth Trail in rural Hamblen County when the driver encountered a log blocking the road near Williams Cemetery. At the point where the vehicle stopped, the road had become gravel and would have been entering a grassy area had the log not blocked its path. The pursuit had spanned roughly 5 miles at this point, and as the

---

[1] While Deputy Giles is no longer employed as a police officer, he shall still be referred to as Deputy Giles throughout this Report and Recommendation given that he was acting in his capacity as a deputy when the events at issue took place.

pickup truck came to a stop, officers observed the driver of the vehicle climb out of the driver's side window. Deputy Barker ordered the driver to remain on the ground and proceeded to place the driver in handcuffs. Deputy Barker testified that the driver, ultimately identified as James Ward, was immediately placed under arrest because he had fled from officers.

At the same time, Deputy Giles was attempting to have Defendant, who was in the passenger's seat, exit the vehicle. Deputy Giles ordered Defendant out of the vehicle multiple times, but Defendant refused to comply, ultimately telling the officer that something was wrong with the door and it would not open. Deputy Giles initially had his gun drawn but placed it back in his holster and approached the vehicle with a baton. Deputy Giles broke the passenger's window with his baton in order to extract Defendant from the vehicle. Given the circumstances, Defendant was then handcuffed and detained for the safety of responding officers. Defendant told Deputy Giles that he was experiencing rib pain following his removal through the window, so officers called an ambulance. When the ambulance arrived, Defendant declined assistance.

After Mr. Ward was arrested and Defendant was detained, Deputy Barker returned to the pickup to turn off its engine which continued to run as officers detained the driver and passenger. Deputy Barker reached through the driver side door to power off the vehicle. As he turned off the truck, he noticed two small baggies—one clear and one pink—in the driver's side floorboard. Based on his experience in narcotics, Deputy Barker advised that the bags appeared to be consistent with drug paraphernalia. While admitting the bags alone would not be a basis for a drug arrest, Deputy Barker testified that he could not determine whether the bags were empty or contained residue while turning off the vehicle. Deputy Barker undertook a search of the vehicle based upon observing the baggies. In addition to the two bags, Deputy Barker recovered a green Crown Royal bag in the gap between driver and passenger seats. Inside the bag, Deputy Barker found a glove, a

digital scale, and a bag containing a white powdery substance consistent with methamphetamine. The passenger side of the vehicle was also searched and a bag containing a green leafy substance consistent with marijuana was discovered in the glove compartment.

Deputy Barker, having finished the vehicle search, read Mr. Ward and Defendant their Miranda rights and asked whether each man understood those rights with both confirming that they did. Defendant and Mr. Ward waived their right to remain silent and denied that the drugs found in the vehicle belonged to them when Deputy Barker asked about them. Given that both Defendant and Mr. Ward had the drugs and paraphernalia found in the truck within arm's reach and neither claimed ownership of them, officers charged both men with constructive possession. It was at this point that Defendant was placed under arrest.

After arresting Defendant, officers conducted a pat-down search of Defendant and discovered suboxone strips in his wallet. While Defendant told Deputy Giles that he had a prescription for the substance, no evidence of a prescription had been provided as of the date of the hearing. Defendant and Mr. Ward were subsequently transported from the scene. According to Deputy Barker, approximately ten minutes elapsed between the time the time he turned on his blue lights and the time Defendant and Mr. Ward were initially detained.

## II. LEGAL ANALYSIS

As a preliminary matter, the Court must consider whether officers had a valid basis for initiating a stop of the pickup truck. "An officer may stop and detain a motorist so long as the officer has probable cause to believe that the motorist has violated a traffic law." *United States v. Bell*, 555 F.3d 535, 539 (6th Cir. 2009). Here, officers relied on the pickup truck crossing a double yellow line at least twice as their basis for signaling for the pickup to stop. Tennessee law requires drivers to operate vehicles on the right half of the roadway unless a listed exception applies. Tenn.

Code Ann. § 55-8-115.[2] Both Deputy Barker and Deputy Giles testified that they observed both driver's side tires of the pickup truck cross the double yellow line prior to Deputy Barker's activating his blue lights. Because crossing the double yellow line violates the general rule requiring drivers to stay on the right side of the road, the officers were justified in initiating the traffic stop.[3]

Because the stop was justified pursuant to state law, the Court next considers whether officers were permitted to detain Defendant once the vehicle was stopped. The Sixth Circuit has stated that "if police have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony, then a *Terry* stop may be made to investigate that suspicion." *United States v. Jackson*, 700 F. App'x 411, 415 (6th Cir. 2017) (quoting *United States v. Hensley*, 469 U.S. 221, 229 (1985)) (internal citations omitted). Courts look at the totality of the circumstances known to officers when determining whether a temporary detention was justified. *United States v. Ellis*, 497 F.3d 606, 613 (6th Cir. 2007) (citing *United States v. Arvizu,* 534 U.S. 266 (2002)). The detaining officers may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *United States v. Ellis*, 497 F.3d 606, 613 (6th Cir. 2007) (quoting *United States v. Martin,* 289 F.3d 392, 398 (6th Cir.2002)) (internal citations omitted).

Here, Defendant alleges that he was improperly seized solely as a result of Mr. Ward's actions. Defendant argues that he did not operate the pickup truck and there is no evidence to show

---

[2] This provision is unquestionably a traffic law as it falls within a chapter covering the rules of the road. Tenn. Code Ann. § 55-8-102.
[3] Even if the Court were to find that there was not a proper basis to originally initiate a stop, the driver's failure to stop at two stop signs during the ensuing pursuit offered another basis for the stop. § 55-8-149; see also *United States v. Jackson*, 682 F.3d 448, 453 (6th Cir. 2012) (upholding a district court order admitting evidence from a traffic stop for a minor turn signal violation even where another basis—a BOLO alert matching the suspect's vehicle—may or may not have provided sufficient basis to initiate a traffic stop).

that he supported the driver's decision to evade officers. Courts have found that officers may temporarily detain all occupants of a fleeing vehicle for the safety of officers. *See Maryland v. Wilson*, 519 U.S. 408, 413-15 (1997) (holding that an officer making a traffic stop may order passengers out of the vehicle for the safety of officers); *Kowolonek v. Moore*, 463 F. App'x 531, 536 (6th Cir. 2012) (noting that "a subject's attempt to flee or demonstrated flight risk may render handcuffing and detention in a cruiser objectively reasonable" during a temporary detention). In this case, Defendant refused to comply[4] when Deputy Giles directed him to leave the vehicle. Deputy Giles then approached the passenger side door, attempted to open the door without any luck, and ultimately decided to extract Defendant through the vehicle door window. Deputy Giles smashed the window with a police baton and pulled Defendant through the window. Defendant was then placed in handcuffs in the interest of safety, given his noncompliance with commands to exit the vehicle and to prevent him from fleeing the scene. The Court does not find placing Defendant in handcuffs in these circumstances to amount to an unlawful detention given his presence in the vehicle that evaded police.

Defendant also contends that Deputy Giles used excessive force when he extracted Defendant from the pickup truck through the window. To determine whether the force used was excessive, courts undertake "a careful balancing of the individual interest in being free from unreasonable seizures and the governmental interest in protecting the safety of its peace officers and the public." *Dorsey v. Barber*, 517 F.3d 389, 401 (6th Cir. 2008) (internal citations omitted). The Government directs the Court to an unpublished case from the Sixth Circuit in which a driver was pulled through a vehicle window after leading officers on a high-speed chase and not exiting

---

[4] While Deputy Giles acknowledges that Defendant shouted that the door wouldn't open after Deputy Giles had already instructed him to exit several times, Deputy Giles also testified that after he had broken out the window and unlocked the passenger side door that the door did open which would lead a reasonable officer to conclude that Defendant intentionally refused to comply with the command to exit the vehicle.

the vehicle when directed by those officers. *See Blosser v. Gilbert,* 422 F. App'x 453, 459 (6th Cir. 2011) (finding the action of pulling a suspect through a vehicle window in these circumstances was not per se unreasonable).

In balancing Defendant's interest versus officer safety in the instant action, the Court cannot overlook the fact that officers were led on a five-mile pursuit which only ended because the pickup truck's path was blocked. When the vehicle came to a stop, the driver attempted to flee by climbing out of the driver's side window. Responding officers knew the pickup truck in question had left a location where drugs were frequently sold. Officers witnessed the pickup truck break multiple traffic laws. Once the truck was stopped, Defendant refused to comply with police commands to exit the vehicle. When Deputy Giles tried to open his door, the door was locked. While the Court acknowledges that Defendant was a passenger and not the driver of the vehicle, there was no way for officers to know at that moment in time to what extent Defendant was involved in the decision to flee officers nor what danger he might pose to their safety. These facts, when taken together, justify Deputy Giles' actions in extracting Defendant through the pickup truck's window.

After Defendant was extracted and detained, Deputy Barker returned to search the vehicle. Only a very brief time period passed from the moment that Defendant was extracted, and Deputy Barker began his search until methamphetamine was found in the pickup truck. The Court also notes that by this time, Defendant had been identified and was known to officers to be dangerous as they had completed a controlled by of drugs and a gun from him in the month prior to the incident at issue. Of note, the controlled by occurred at the address where the pickup truck had been located immediately prior to officers following it. The Court finds that the length of Defendant's detention was not unreasonable given the totality of the circumstances in order to

allow officers to investigate what had led the driver of the pickup truck to flee from them and to ensure officer safety from both the driver and Defendant. See *U.S. v. Sharpe,* 470 U.S. 675, 687 (1986) (holding that a 20-minute detention where an officer diligently pursued his investigation, especially in light of the rapidly developing situation, was not unreasonable because it was designed to swiftly confirm or dispel suspicions).

Defendant also claims that this warrantless search of the pickup truck violated his rights. The Supreme Court has explained that "Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted." *Rakas v. Illinois*, 439 U.S. 128, 133-34 (1978) (internal citations omitted). As such, the Court must consider whether as a mere passenger in the pickup truck, Defendant had a privacy interest in the vehicle's content which would provide him with the requisite standing to challenge the search. Precedent tells us he did not. The Sixth Circuit has "routinely held that passengers who have no expectation of privacy or possessory interest in a stopped vehicle do not have standing to challenge the validity of a subsequent search of that vehicle on Fourth Amendment grounds." *United States v. Bah*, 794 F.3d 617, 626 (6th Cir. 2015). (citing *United States v. Decker*, 19 F.3d 287, 288-89 (6th Cir. 1994) (a conspirator had no expectation of privacy in a vehicle belonging to another member of the conspiracy); *United States v. Ellis*, 497 F.3d 606, 612 (6th Cir. 2007) (explaining that while a passenger may challenge a stop and a subsequent detention, they may not challenge the search of a vehicle in which they lack an expectation of privacy)).

Here, Defendant does not assert that he owns the pickup truck at issue or has a possessory interest in it. Absent such a showing, Defendant cannot demonstrate that he had a reasonable expectation of privacy in the vehicle; therefore, he lacks standing to challenge the search at issue. As a result, the Court finds that the drugs found by officers when the pickup truck was searched

provided the necessary probable cause to permit Defendant's warrantless arrest for constructive possession.

### III. CONCLUSION

The Court finds that stop, detention, and arrest of Defendant were lawful. Based on these findings, the undersigned **RECOMMENDS** that Defendant's Motion to Suppress [Doc. 255] be **DENIED**.[5]

Respectfully Submitted,

s/Cynthia Richardson Wyrick
United States Magistrate Judge

---

[5] **Any objections to this report and recommendation must be served and filed by February 23, 2021 with responses due February 25, 2021**. Fed. R. Crim. P. 59(b)(2). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); *see United States v. Branch*, 537 F.3d 582 (6th. Cir. 2008); *see also Thomas v. Arn*, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the time period waives the right to appeal the District Court's order). The District Court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive, or general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).